UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SADE Y. MORGAN,

               Plaintiff,                               Case No. 13-10023
                                                          Honorable Thomas L. Ludington

v.

J.C. PENNEY COMPANY, INC.,

               Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       Sade Morgan (Morgan) worked for J.C. Penney Company, Inc. (JCPenney) for over five years—from September 2006 until December 2011. On December 8, 2011, Morgan's employment was terminated because JCPenney believed she stole store merchandise. She filed a complaint alleging that she was not fired for theft, but because JCPenney believed she had a mental disability. Because Morgan has not demonstrated that the ultimate decision-maker knew, or had reason to know, of her alleged disability, her complaint will be dismissed.

**I**

       Morgan suffers from a learning disability[1]—she has "trouble with reading and math, and understanding, comprehending." Morgan Dep. 47, *attached as* Def.'s Mot. Ex. B, ECF No. 21. She claims that as a result, she was "connected with Michigan Rehabilitation Services, a state agency which assists those with mental disabilities find gainful employment." Pl.'s Resp. 4, ECF No. 25. According to Morgan, Michigan Rehabilitation Services "hired an independent company" to help her find a job: Selective Case Management (SCM).

---

[1] JCPenney has conceded, only for the purpose of its motion for summary judgment, that "Morgan was in fact disabled . . . ." Def.'s Mot. 7.

On June 9, 2006, Morgan signed a contract with SCM to participate in a training program "to gain employable skills."  Pl.'s Resp. Ex. 1, at 8.  In a related "consumer profile" created the same day, Dawn Mahoney—Morgan's case worker with SCM—indicated that Morgan suffered from "Mild Mental Retardation" and a "Specific Learning Disability," with handwritten notes in the margin indicating "Adjustment Disorder, Anxiety, Depression."  *Id*. at 1.

After connecting with SCM, Morgan participated in SCM's "community based Work Experience program" from August 10, 2006, through September 10, 2006.  Pl.'s Resp. Ex. 2, at 2.  During that period, she worked as a "stock clerk" in JCPenney's Saginaw, Michigan location. *Id*.  A September 13, 2006 work experience program report, also created by Ms. Mahoney, acknowledges that Morgan's "disabilities are mild mental retardation, adjustment disorder with anxiety, and depression."  *Id*.  But in the report, Ms. Mahoney indicates that Morgan "was observed and evaluated" during the work experience program, and she "was observed to always meet goals regarding proper work ethics and etiquette, work skills, employee interaction, and supervisor interaction skills."  *Id*.  Indeed, Ms. Mahoney emphasized that Morgan "was offered a position with JC Penney at the end of this work experience and she accepted."  *Id*.

In September 2006—when Morgan was hired—Rory McColgan managed sales for the Women's Department in JCPenney's Saginaw location.  McColgan Aff. ¶ 2, *attached as* Def.'s Mot. Ex. C.  Mr. McColgan was also Morgan's supervisor while she worked at JCPenney through SCM's work experience program.  He acknowledged that he was aware Morgan came to JCPenney through "the Michigan Works program," and that he spoke with a Michigan Works representative concerning Morgan's participation in the program.  *Id*. ¶ 3.  According to Mr. McColgan, however, he was "never told that Morgan was disabled," and he did "not regard her participation in the Michigan Works program as an indication that she was disabled."  *Id*.  That

Mr. McColgan did not perceive Morgan as mentally disabled is supported by information he supplied for two "Employer Follow Up" logs in August 2006. On August 15, Mr. McColgan indicated that Morgan was "a quick learner" and that when she was shown "a task once . . . she does it." Pl.'s Resp. Ex. 4, at 1. On August 31, Mr. McColgan indicated that Morgan "will be offered a position when [work experience] is completed. No concerns. Excellent employee." *Id.* at 2. In his affidavit, Mr. McColgan confirmed that after Morgan's work experience through SCM ended, she "applied for employment with JCPenney as a part-time associate in the Women's Department." McColgan Aff. ¶ 3.

## A

Prior to being officially hired by JCPenney, Morgan took a customer service aptitude test as a part of the application process. *Id.* ¶ 4; *see also* Pl.'s Resp. 6. Mr. McColgan explained that "[i]f Morgan passed the test, her name would appear in the pool of available applicants for hiring managers. If not, she would have been told that she could re-apply in six months." McColgan Aff. ¶ 4. According to Mr. McColgan, "Morgan's name appeared in the pool of available applicants," so he invited her to come in for an interview. *Id.* As a result of the fact that Morgan was listed as an available interviewee, Mr. McColgan believes she passed the preliminary customer service aptitude test. He described her demeanor during the subsequent interview as "friendly and energetic." *Id.* ¶ 5. Mr. McColgan asserted that during the application process, Morgan never indicated she was mentally disabled or would require accommodations to perform the job she had applied for, that she never indicated she was bad at math or had difficulty reading, and that there was "nothing" about his interactions with Morgan—at any point—that led him to believe she was mentally disabled. *Id.*

Morgan, on the other hand, argues that she "fail[ed] th[e] simple cognitive test" that was a part of the application for a position with JCPenney.  Pl.'s Resp. 6.  In support of this contention, Morgan provides what appears to be a computer-screen printout listing "Manual Test Results" for "Sade Y. Morgan."  *See* Pl.'s Resp. Ex. 6.  The printout indicates that Morgan took a customer service test on September 12, 2006, and achieved a total score of 141.  *Id.*  However, as JCPenney notes in its reply brief, "there is no indication" what raw score was necessary to pass, Def.'s Reply 3, ECF No. 29, and so Morgan's results are not entirely helpful.  Morgan did testify at an unemployment-benefits hearing that she took a test during her application for a position with JCPenney, and that she "did not pass."  May 9, 2012 Hr'g Tr. 43, *attached as* Pl.'s Resp. Ex. 12.

### B

Regardless of whether she passed the customer service test, it is undisputed that Morgan was hired by JCPenney on September 28, 2006, and that she then worked there—without incident—until November 1, 2011.  Mr. McColgan, who supervised Morgan from the beginning of her employment until he left the Saginaw JCPenney in February 2007, indicated that he "did not question [Morgan's] ability to perform her job while [he] supervised her."  McColgan Aff. ¶ 5.  Mr. McColgan "did not believe" that Morgan was disabled, and he never told her subsequent manager, "or any other member of management at the Saginaw store," that Morgan was disabled or that he believed her to be so.  *Id.* ¶ 6.

When Mr. McColgan moved on from JCPenney's Saginaw location in 2007, Kevin Patnode was hired to act as store manager.  Patnode Aff. ¶ 2, *attached as* Def.'s Mot. Ex. G.  According to both Mr. Patnode and Mr. McColgan, the two never discussed Morgan, her employment with JCPenney, or the possibility that she suffered from a mental disability.  *Id.* ¶ 3;

McColgan Aff. ¶ 6.  Like McColgan, Mr. Patnode "interacted with [Morgan] regularly" during her work, but there was nothing about those interactions that led him to believe she "suffered from any type of disability."  Patnode Aff. ¶ 4.  Moreover, two women that worked closely with Morgan while she was with JCPenney—Patricia Lazowski and Leia Lopez-Gamboa—stated that Morgan never appeared to have difficulty performing her assigned tasks and never did anything to indicate that she was mentally disabled.  Lazowski Aff. ¶¶ 4, 5, *attached as* Def.'s Mot. Ex. D; Lopez-Gamboa Aff. ¶¶ 4, 5, *attached as* Def.'s Mot. Ex. E.

Seemingly in agreement, Morgan indicates that she worked at JCPenney "for five years," and that "[d]uring this time, she received satisfactory reviews and continued to improve in a generally upward way.  For more than five years, Ms. Morgan was even given merit pay raises. In simple terms, Morgan was a good and loyal employee."  Pl.'s Resp. 6 (footnote and citation omitted).

### C

Morgan was not scheduled to work at the JCPenney store on November 1, 2011, but she visited that day with her young daughter to purchase a few items.  She claims that she had "a number of discount coupons and employee discounts that she had collected to buy various items, included [sic] some clearance items."  *Id*. at 7.

After she had collected the items that she wanted to buy, Morgan approached the cash register to pay for those items "and to redeem/use her various promotional and discount coupons."  *Id*.   Among the items she had was a pair of high-heeled boots, originally priced at $99.99 and marked down to $69.99.  Morgan placed her items on the checkout counter, and "Vanissa Green" began to ring her up.  However, both Ms. Green and Morgan stepped away from the register before the transaction was complete, and Morgan later reappeared with a

different JCPenney employee, Lisa Grant, who continued the checkout process that Ms. Green had previously started. Ms. Grant voided the items Ms. Green had entered and then re-rang some of them, omitting the boots. Ultimately, Morgan tendered a total of $1.90 for the items she was purchasing—a total that included the boots priced at $69.99.

Ms. Grant printed Morgan's receipt and placed it in the box with the high-heeled boots. Morgan then removed the receipt from the box and reviewed it with Ms. Grant before returning the receipt to the box. Ms. Grant then bagged Morgan's items, and Morgan left the store.

JCPenney employs a loss prevention protocol that requires loss prevention officers to review electronic cash register data and reports "to look for anomalies, including deleted items and voided transactions." Bolinger Aff. ¶ 3, *attached as* Def.'s Mot. Ex. F. Ken Bolinger is the Loss Prevention Lead Expert for JCPenney's Saginaw location, and he has occupied "a similar Loss Prevention position in the Saginaw store since 1993." *Id.* ¶ 2. He was reviewing electronic cash register data sometime shortly after November 1, 2011, when he came across the transaction involving Morgan and Ms. Grant and "a number of deleted items." *Id.* ¶ 3. Although neither Ms. Grant nor Morgan were the target of Mr. Bolinger's investigation, the number of deleted and voided items involved in the transaction caught his attention, and he collected information on the transaction from a Loss Prevention database and the digital surveillance video. *Id.*

Upon reviewing the information, Mr. Bolinger established that "Morgan had purchased a total of eight items for the sum of $1.90. Included in the items that Morgan purchased was a pair of Call-It-Spring boots, originally priced at $99.99 and marked down to $69.99." *Id.* ¶ 4. Mr. Bolinger noted that Ms. Grant and Morgan reviewed the receipt together before Morgan left the store with her merchandise. Based on what he had seen, and his experience in Loss Prevention, Mr. Bolinger "believed that Morgan and Grant worked together to violate company policies and

to deprive [JCPenney] of property." *Id.* ¶ 5.  So Mr. Bolinger requested permission from Mr. Patnode to interview Morgan and Ms. Grant.  Although both women "denied that they had violated procedures or been involved with any wrongdoing," Mr. Bolinger continued to believe "that Grant and Morgan had violated company policy." *Id.*

Mr. Bolinger presented his findings to Mr. Patnode, who "determined that Morgan had taken eight items of merchandise from the store, including a pair of boots marked $69.99, when she only paid $1.90 for the merchandise." Patnode Aff. ¶ 5.  Mr. Patnode "determined that this was a violation of company sales procedures and that both Morgan and Grant should be terminated for the same." *Id.*  Mr. Patnode then consulted with Human Resources in JCPenney's home office before "moving forward with the terminations" on December 7, 2011 (Ms. Grant), and December 8, 2011 (Morgan). *Id.*

According to Mr. Patnode, "[a]t no time, up to and including the meeting in which she was terminated, did Morgan ever inform [him] that she was disabled or required any type of accommodation to perform her job." *Id.* ¶ 6.  Because he did not believe Morgan was disabled, Mr. Patnode claims any alleged disability "played no part in [his] decision to terminate her.  [He] only considered the results of the Loss Prevention investigation, from which [he] concluded that Morgan had taken company property without paying for it." *Id.*

### D

After her employment was terminated, Morgan requested unemployment benefits; JCPenney denied the request pursuant to Mich. Comp. Laws § 421.29, which precludes unemployment benefits for employees "discharged for theft . . . ."  Mich. Comp. Laws § 421.29(1)(i).  Morgan appealed that decision, and a hearing was held on May 9, 2012, before Administrative Law Judge Nancy L. Bondar.  Judge Bondar concluded that JCPenney "did not

demonstrate that [Morgan] had any intent to permanently deprive [JCPenney] of its property." Bondar Decision 2, *attached as* Pl.'s Resp. Ex. 17.  As a result, Judge Bondar held that Morgan could not be disqualified from unemployment benefits under Mich. Comp. Laws § 421.29(1)(i).

On January 1, 2013, Morgan filed a complaint against JCPenney alleging that it violated the Americans with Disabilities Act (ADA) and Michigan's Persons With Disabilities Civil Rights Act (PWDCRA), when it "wrongfully terminated" her "because [she] is and was an individual with a disability."[2]  Pl.'s Compl. ¶¶ 26, 34, ECF No. 1.  On December 20, 2013, JCPenney filed a motion for summary judgment, arguing that Morgan cannot meet her prima facie burden, or show that the stated reason for her termination was a pretext for discrimination.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986).  All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

---

[2]  In her complaint, Morgan also claimed that JCPenney violated the ADA and the PWDCRA by "wrongfully den[ying] hourly work to [her] . . . ."  Pl.'s Resp. 2 n.1.  But Morgan goes on to indicate that she "lacks the evidence needed" to support those claims, and so those theories will be dismissed and not discussed further.

### III

Morgan asserts that she is disabled within the meaning of the ADA and the PWDCRA, and that this disability motivated JCPenney's decision to terminate her employment. The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002)). Although resolution of an ADA claim will not always resolve a corresponding PWDCRA claim, both JCPenney and Morgan have indicated that resolution of her ADA claim will govern the outcome of her PWDCRA claim. *See* Def.'s Mot. 15 ("Morgan cites to nothing in her case that would produce a different result if the facts were considered under the Michigan PWDCRA versus the ADA."); Pl.'s Resp. 21 ("Morgan and [JCPenney] are in agreement in one respect: Michigan's PWDCRA substantially mirrors the ADA, and resolution of Morgan's ADA claim will generally resolve her PWDCRA claim."). As such, the Court will analyze Morgan's discrimination claims under the ADA.

### A

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a). In the Sixth Circuit, a plaintiff establishes a prima facie case of discrimination under the ADA—through indirect evidence[3]—by establishing the following five elements:

> 1) that she is disabled, 2) that she is otherwise qualified for the position, with or without reasonable accommodation, 3) that she suffered an adverse employment action, 4) that the employer knew or had reason to know of her disability, and 5)

---

[3] Morgan does not claim to present direct evidence of discrimination, and only analyzes her claim under the indirect evidence standard. *See* Pl.'s Resp. 13.

that the position remained open while the employer sought other applicants or the disabled individual was replaced.

*White v. Standard Ins. Co.*, 529 F. App'x 547, 549 (6th Cir. 2013); *see also Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (same). This initial burden is "not onerous." *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 501 (6th Cir. 2011) (citation omitted).

If Morgan can satisfy her prima facie burden, then it is necessary to apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly, once Morgan satisfies her prima facie burden, "there is a presumption of discrimination, and the burden shifts to the defendant to rebut the presumption by providing evidence of a 'legitimate, nondiscriminatory' reason for the action taken." *Idemudia*, 434 F. App'x at 501 (citation omitted). If JCPenney is able to satisfy this burden "with a legally sufficient explanation, the burden shifts back to the plaintiff to show that the defendant's proffered reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citation omitted). Notably, "[t]hroughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Id.* (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

**B**

JCPenney correctly notes that Morgan must first carry her prima facie burden to escape summary judgment; however, when analyzing the facts, JCPenney employs the wrong prima facie elements. In its motion for summary judgment, JCPenney indicates that Morgan's prima facie case involves four elements: "(1) Morgan was protected under the ADA; (2) JCPenney knew Morgan was protected; (3) JCPenney took an adverse action against Morgan; and (4) there was a causal connection between the adverse action and Morgan's protected status." Def.'s Mot.

7.  To support the application of these four elements, J.C. Penney advances *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).  And, it is true, the four elements J.C. Penney discusses match those set forth in *A.C. ex rel*.  *See id*.

But in *A.C. ex rel.*, the Sixth Circuit addressed a claim for retaliation under the ADA, not a claim for discrimination.  Indeed, the court indicated that the plaintiff's burden was "to present a prima facie case *of retaliation*."  *Id.* (emphasis added).  And rather than requiring the four elements JCPenney advances, courts in this Circuit require that a plaintiff bringing a discrimination claim demonstrate the five prima facie elements—outlined above—set forth in W*hitfield*.  So instead of requiring that a plaintiff demonstrate causation during the prima facie stage, as JCPenney would like, a plaintiff must only demonstrate that she "was, in fact, discharged because of the disability . . . through [the] two additional burden shifts" required under *McDonnell Douglas*.  *Whitfield*, 639 F.3d at 259.

Moving to Morgan's prima facie evidence of discrimination, JCPenney has conceded (for purposes of its motion for summary judgment only) that Morgan was disabled and otherwise qualified for her position.  *See* Def.'s Mot. 7.  That leaves whether Morgan suffered an adverse employment action, whether JCPenney knew or had reason to know of her disability, and whether she was subsequently replaced (or the position remained open while JCPenney sought other applicants).

But because JCPenney did not utilize the correct prima facie elements, it did not address either whether Morgan was replaced or her position remained open while other applicants were sought out, or whether she suffered an adverse employment action.  Of course, JCPenney "bears the initial responsibility" of identifying those portions of the pleadings and the record demonstrating that no genuine issue of material fact exists.  *Kuns v. Ford Motor Co.*, 543 F.

App'x 572, 575 (6th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Moreover, summary judgment is warranted only "if the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

*Shaffer v. CSX Transp., Inc.*, 462 F. App'x 597, 599 (6th Cir. 2012) (quoting Fed. R. Civ. P.

56(a)).  Because JCPenney neglected to demonstrate that there was no genuine dispute as to

whether Morgan suffered an adverse employment action, or concerning whether her position

remained open or she was replaced, the Court will presume—for purposes of this opinion—that

genuine disputes of fact remain as to those elements, or that JCPenney does not dispute the

issue.[4]

Accordingly, the only element of Morgan's prima facie case that is contested in

JCPenney's motion is whether it knew, or had reason to know, that she was disabled.  Upon

review, Morgan has not carried her burden with respect to this element, and summary judgment

is appropriate.

The Sixth Circuit has established that "an employee cannot be considered to have been

fired 'on the basis of disability' unless the individual decision-maker who fired the individual

had knowledge of that disability."  *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th

Cir. 2013) (collecting cases).  Here, it is uncontested that Mr. Patnode—the store manager for

JCPenney's Saginaw location in December 2011—was the sole decision-maker responsible for

the termination of Morgan's employment.  *See* Patnode Aff. ¶ 5 ("I terminated Morgan for

violation of sales procedures."); Incident Report 3, *attached as* Def.'s Mot. Ex. F ("Patnode

---

[4] And at least one of the elements JCPenney did not raise—that Morgan suffered an adverse employment action—
cannot seriously be doubted.  Under the ADA, an adverse employment action is a "materially adverse change in the
terms or conditions of employment because of the employer's conduct."  *Talley v. Family Dollar Stores of Ohio,
Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (brackets, ellipsis, and citation omitted).  When JCPenney terminated
Morgan's employment, there was a material, adverse change in the conditions of her employment.

concluded Grant and Morgan would be terminated."); Pl.'s Resp. Ex. 14 (JCPenney HR Specialist providing "recommendation" to Mr. Patnode for employment decisions). Accordingly, Morgan must demonstrate that Mr. Patnode knew, or should have known, of her disability when he decided to fire her.

While discussing how she has demonstrated that JCPenney "knew" of her disability, Morgan never mentions Mr. Patnode at all. Instead, she argues that JCPenney knew of her alleged disability through Mr. McColgan, her supervisor. She argues that Mr. McColgan was aware of her mental impairments through meetings with SCM staff:

> According to the Work Experience Program Report, "meetings were accomplished with the client's supervisor, Rory McColgan, to obtain updates and feedback on Ms. Morgan's performance and work ethics, as well as tasks learned and accomplished during working hours. McColgan told Mahoney that "there were no issues or concerns . . ." By this process, JCP[enney] had knowledge that Morgan had a disability which would affect her abilities for work performance.

Pl.'s Resp. 5 (brackets and internal citations omitted). Morgan also asserts that JCPenney, again through Mr. McColgan, knew "that [she] was hired from a program which places the mentally disabled with employment in the community." *Id*.

But Mr. McColgan submitted an affidavit indicating that he was never aware of Morgan's alleged disability. McColgan Aff. ¶ 5. Moreover, even if the evidence Morgan has advanced sufficiently demonstrated that Mr. McColgan knew she had a mental disability, there is nothing in the record to support attributing Mr. McColgan's knowledge to Mr. Patnode. Both men have asserted that they never discussed Morgan, her employment with JCPenney, or the possibility that she was disabled. *Id*. ¶ 6; Patnode Aff. ¶ 3. Further, Mr. McColgan left JCPenney in February 2007 before Mr. Patnode began as Store Manager for the Saginaw store. Patnode Aff. ¶ 3.

There are other individuals whom Morgan asserts knew of her alleged disability:

- 13 -

> First, Morgan specifically told JCP[enney] staff that she suffered from a learning disability.  As noted in her testminoy in the administrative hearing, the then-serving store director Mr. Kellstrom asked Morgan "Was anybody in the building aware that you had a learning disability—in math?"  Morgan answered "yes" and explained that "Pat Wazolski" was involved in relation to the math test administered by her—the same math test Morgan did not pass.

Pl.'s Resp. 14.  Morgan claims in her papers that she also told Mr. Bolinger "of her disability" but that he "ignored the notice, being more concerned about 'catching' Morgan than understanding the nature of what actually happened with the Grant transaction."  *Id*. at 15.

Of course, in her affidavit, Morgan did not claim to have told Bolinger of her mental disability; only that she "could not write well and had trouble with math."  Morgan Aff. ¶ 5, *attached as* Pl.'s Resp. Ex. 18.  However, simply communicating the *symptoms* of her alleged disability—trouble with writing and math—does not suffice with communicating the existence of the disability itself.  *See Nilles*, 521 F. App'x at 369; *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (although employer knew of plaintiff's emotional problems, employer was not charged with knowledge of underlying disability because the plaintiff "never suggested that his emotional problems stemmed from a condition of disability.").  Finally, as with Mr. McColgan, even if Mr. Kellstrom or Pat Wazolski or Mr. Bolinger knew Morgan was disabled—an issue far from dispute—there is nothing in the record to support imputing that knowledge to Mr. Patnode, particularly in light of the fact that Mr. Patnode specifically denied any knowledge of Morgan's alleged disability.  Patnode Aff. ¶ 6.  This assertion remains uncontradicted.

The only other possibility for Morgan to satisfy this prima facie element is demonstrating that Mr. Patnode "had reason to know" of her alleged disability.  *See Whitfield*, 639 F.3d at 259.  Here, Morgan mistakenly relies on the evidence previously discussed:

> The same facts come into play which could easily fulfill whether JCP[enney] had reason to know of [Morgan's] disability.  It has reason to know that Morgan suffered from a disability when it interacted with the staff of [SCM] to hire certain participants of the "Work Experience Program" from the Michigan Rehabilitation Services, an agency that

> whose [sic] sole purpose is to assist those with mental disabilities find gainful employment. This, together with the statements of Morgan to JCP[enney] staff and Bollinger [sic], and the result of the math test, fulfills that JCP[enney] had reason to know of [Morgan's] disability.

Pl.'s Resp. 15. As before, however, Morgan does not attempt to show that Mr. Patnode, the decision maker here, had reason to know of her disability. And none of the evidence she emphasizes suggests that he did.

To begin, Mr. Patnode never interacted with SCM staff during the period when Morgan was enrolled in the work experience program, or during her application process. In fact, Morgan was hired months before Mr. Patnode started at JCPenney's Saginaw location. Patnode Aff. ¶ 3. Notably, Morgan has not identified any evidence in the record that demonstrates Mr. Patnode had reason to know of her alleged statements to any JCPenney staff member, or the results of the math test she supposedly failed six months before he became Store Manager of the Saginaw location. Because Morgan has not advanced any evidence that Mr. Patnode knew—or had reason to know—of her alleged disability, she has not satisfied her prima facie burden, and summary judgment is appropriate on Morgan's claims.[5]

### IV

Accordingly, it is **ORDERED** that JCPenney's motion for summary judgment, ECF No. 21, is **GRANTED**.

It is further **ORDERED** that Morgan's complaint, ECF No. 1, is **DISMISSED** with prejudice. This is a final order and closes the case.

Dated: March 31, 2014                              s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

---

[5] As indicated previously, because the parties have emphasized that resolution of Morgan's ADA claim will govern her PWDCRA claim, the Court will not analyze the PWDCRA claim beyond the foregoing discussion of the ADA.

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 31, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS